RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RONALD MOORE; GINA WALDROP; DONALD MOORE, JR.,

　　　　　　　　　　*Plaintiffs-Appellants*,

　　*v.*

CITY OF MEMPHIS; PHILLIP PENNY,

　　　　　　　　　　*Defendants-Appellees*.

No. 16-5552

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:14-cv-02089—S. Thomas Anderson, District Judge.

Argued: February 1, 2017

Decided and Filed: April 10, 2017

Before: BATCHELDER, SUTTON, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeffrey S. Rosenblum, ROSENBLUM & REISMAN, P.C., Memphis, Tennessee, for Appellants. Richard J. Myers, GLANKLER BROWN, PLLC, Memphis, Tennessee, for Appellee City of Memphis. Betsy McKinney, GODWIN, MORRIS, LAURENZI & BLOOMFIELD, P.C., Memphis, Tennessee, for Appellee Penny. **ON BRIEF:** Jeffrey S. Rosenblum, Marc E. Reisman, ROSENBLUM & REISMAN, P.C., Memphis, Tennessee, Howard B. Manis, MANIS LAW FIRM, Memphis, Tennessee, for Appellants. Richard J. Myers, GLANKLER BROWN, PLLC, Memphis, Tennessee, Henry L. Klein, APPERSON CRUMP PLC, Memphis, Tennessee, for Appellee City of Memphis. Betsy McKinney, Deborah Godwin, GODWIN, MORRIS, LAURENZI & BLOOMFIELD, P.C., Memphis, Tennessee, for Appellee Penny.

　　KETHLEDGE, J., delivered the opinion of the court in which BATCHELDER and SUTTON, JJ., joined. BATCHELDER, J. (pg. 8), delivered a separate concurring opinion.

---

**OPINION**

---

KETHLEDGE, Circuit Judge.   Phillip Penny, a Memphis police officer, fatally shot Donald Moore, Sr., after Moore pointed a gun at him during the execution of a search warrant at Moore's home.  Moore's children sued Penny and the City of Memphis under 42 U.S.C. § 1983, alleging constitutional violations that they say resulted in Moore's death.   The district court granted summary judgment for the defendants, holding that they did not violate Moore's constitutional rights.  We affirm.

I.

On September 5, 2012, Memphis Animal Services received its third complaint regarding potential animal cruelty at Moore's home.   The following month, an animal-control officer, Carol Lynch, went to Moore's residence to investigate.  Moore did not come to the door initially, but Lynch spoke to Moore's neighbor, Tammy Hillis, who said that Moore had threatened her and that she was "terrified" of him.   Lynch then called the Memphis Police Department for support, and two officers joined her at the scene.  This time, Moore came to the front door and gestured with his hand behind his back as if he had a weapon.  The police officers asked to see Moore's hands, at which point Moore cursed, backed into the house, and shut the door.  One of the officers tried to tell Moore through the door that they just wanted to talk to him about his animals, but Moore responded with more curses.

Soon thereafter, Lynch and John Morgret, a criminal investigator with the Memphis Humane Society, met with Lieutenant Martin Kula and Officer Scott Edwards of the Memphis Police Department.  Based on Lynch's statement, Lieutenant Kula thought that Moore might be unstable.  But Officer Edwards—who was trained in dealing with people with mental illness— saw nothing in Moore's records to indicate that he had a history of violence or was mentally ill.

On January 8, 2013, Officer Edwards and Lynch went to Moore's home.  Moore refused to open the door, but through it Officer Edwards told Moore that Animal Services merely wanted to ensure that his animals were healthy.   Moore kept his door closed, ordered them off his

property, and called 911. His call was directed to Lieutenant Kula, who tried unsuccessfully to get Moore to cooperate. After their interactions with Moore that day, both Officer Edwards and Lieutenant Kula thought that Moore was angry but not mentally ill. The next day, Hillis told Lynch that, after the officers had left the day before, Moore came out of his house with a gun and said he would kill Lynch if she returned. According to Hillis, Moore added that he would "shoot first and then ask questions later" if the officers came back.

On January 10, 2013, Morgret got a warrant to search Moore's home. Lynch and Morgret presented the warrant to Lieutenant Colonel Marcus Worthy, who was in charge of the precinct. Lynch and Morgret told Lieutenant Colonel Worthy that Moore had threatened Lynch and Memphis police officers and that Moore was likely armed. Based on that information, Lieutenant Colonel Worthy decided that TACT (the Memphis Police Department's version of SWAT) should assist in serving the warrant.

TACT uses what it calls a "dynamic entry" when it has probable cause to think that the officers who execute a search warrant will encounter a person armed and dangerous to them. During dynamic entries, TACT often deploys "flash-bangs," which are small, grenade-like devices that disorient persons around them with a sudden loud noise and a very bright light.

After dark on January 11, 2013, Penny led the TACT team to Moore's home. When they arrived, the officers split into two groups—one posted at Moore's front door, and one at the back. At the front door, an officer announced "police department, search warrant," and then broke the living-room window and threw a flash-bang inside. At the rear, Penny then announced "police department, search warrant," entered through the back door, and tossed in another flash-bang. One of the TACT officers saw Moore go down a hallway and enter his bedroom, where Moore called 911. Penny and his team approached the bedroom and called out "Memphis Police" and "we have a search warrant, Don." The officers can be heard doing so on the 911 call. Moore yelled back, "I ain't committed a crime," and "a search warrant, big shit, . . . nothing criminal happened here."

Penny decided to secure the bedroom so that Moore could not barricade himself there. One of the officers threw a flash-bang into the bedroom; Penny followed close behind. Once in

the room, according to Penny, he saw Moore several feet in front of him.  Moore was facing Penny and holding a semi-automatic pistol in his hand—pointed at Penny.  On the 911 tape, after the flash-bang goes off, Penny can be heard yelling, "Hands, Don! Hands, hands, hands!" A couple of seconds later, Penny fired three shots at Moore, killing him.  Another officer entered the bedroom and secured Moore's gun, which was fully loaded with a round in the chamber and still in Moore's hand.  Moore had another pistol in a holster on his belt.  Officers also found a rifle next to the front door and axes next to each door into the house.

A year later, Moore's children sued the city of Memphis and Officer Penny under 42 U.S.C. § 1983, claiming the officers used excessive force in violation of Moore's Fourth Amendment rights.  The defendants moved for summary judgment, which the district court granted.  This appeal followed.

II.

We review the district court's decision de novo.  *Gradisher v. City of Akron*, 794 F.3d 574, 582 (6th Cir. 2015).

To prevail on their § 1983 claims, the plaintiffs must establish that the defendants violated a clearly established constitutional right.  *See Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir. 2015).  Officers violate the Fourth Amendment when they use "excessive force in the execution of a search warrant[.]"  *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (citation omitted).  An officer's use of force is excessive if, under the totality of the circumstances, the force was objectively unreasonable.  *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007).

Here, the district court separated the Memphis Police Department's encounter with Moore into three segments: the Department's decision to use TACT to serve the warrant; TACT's use of a dynamic entry; and Penny's use of deadly force.  Ultimately, however, the district court did not specifically analyze the reasonableness of the decision to deploy TACT; instead, the court found that the reasonableness of that decision merged with the reasonableness of the dynamic entry itself.

A.

As an initial matter, the plaintiffs argue that the district court should have analyzed the police department's decision to use TACT separately from the dynamic entry that resulted from that decision. We disagree: the decision to use TACT was not itself an application of force under the Fourth Amendment. What the TACT team did when they got to Moore's house, however, was an application of force.

So we turn to the question whether the so-called dynamic entry was unreasonable. The plaintiffs say it was, asserting that the TACT team should have knocked (rather than break the living-room window) before entering, and that the team should not have used flash-bangs. Generally, the police must knock and announce their presence before they enter a residence to execute a search warrant. *See Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). But that rule does not apply if the officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile[.]" *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

Here, the officers had several reasons to think that knocking and announcing would be dangerous, to wit: when Moore answered the door for officers during their initial visit to his home, he gestured with his hand behind his back as if he had a weapon; Moore's neighbor, Hillis, told Lynch that Moore had a gun; and (according to Hillis) Moore said he would "shoot first and ask questions later" if the officers came back, and would kill Lynch in particular. Those reasons were enough to allow the officers to execute a no-knock entry. *See United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996). The plaintiffs respond that Hillis's statements were hearsay. But the defendants did not offer those statements for the truth of the matter asserted— that is, to show that Moore actually threatened Lynch and the officers. *See* Fed. R. Evid. 801(c). Instead, the statements were relevant for their effect on the listener—namely, that they made the officers believe that Moore had threatened their safety. *See United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015). The statements were therefore admissible.

The plaintiffs also challenge the officers' use of flash-bangs, both when they entered the house and just before Penny entered Moore's room. To determine whether an officer's use of

flash-bangs was reasonable, we balance the officer's interest in using them against the suspect's interest in forbearance. *Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555, 569 (6th Cir. 2006). Here, as the officers entered Moore's home, they had reason to believe that Moore would pose an immediate threat to their safety. Meanwhile, nothing in the record suggests that flash-bangs themselves posed a danger to Moore: he had no health conditions that made him vulnerable to loud noises or blinding light, and the house contained no accelerants or other substances that could easily ignite. *See Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014). The officers' initial use of flash-bangs was therefore reasonable.

As for the second use, by then Moore had refused to comply with the officers' orders after they entered his home; instead he retreated into his bedroom. Officer Penny feared that Moore would barricade himself there, which could endanger the officers. Suffice it to say that, on this record, we see no basis to second-guess that judgment.

B.

That leaves Officer Penny's decision to shoot Moore. Law enforcement officers may employ deadly force where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). To determine if an officer had such probable cause, "we must consider the totality of the circumstances from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403 (6th Cir. 2015) (internal citations and quotation marks omitted).

The plaintiffs argue that a genuine dispute exists as to whether Moore pointed a gun at Officer Penny; in their view, Penny might have seen the phone in Moore's hand and mistakenly thought it was a gun. Be that as it may, however, the relevant question is not whether Moore in fact had a gun in his hand, but whether Penny reasonably thought that Moore did. And on this record a jury could not find otherwise. Before Penny entered Moore's bedroom, as noted above, Penny had good reason to think that Moore was armed. True, when Penny entered the room, smoke from the flash-bang might have obscured the object in Moore's hand. But the 911 recording makes clear that Penny thought it was a gun: he yelled "Hands, Don! Hands,

hands, hands!" immediately before he shot Moore.  Penny's decision to shoot under these circumstances was the archetype of a split-second decision to which we must defer.  *See id.*

As a matter of law, therefore, the defendants' use of force was not excessive under the Fourth Amendment.  But that does not mean the dynamic entry, in particular, was wise.  The warrant here concerned evidence only of a misdemeanor; and yet the defendants chose a course of action that, though constitutional, unavoidably jeopardized the officers' lives along with Moore's.  In the end Moore was shot, though it just as easily could have been Penny—as the defendants themselves emphasize here.  Meanwhile, the officers plainly had available to them other options that did not involve an immediate physical confrontation.  The officers would have done well to consider them more seriously than they apparently did.

## C.

Finally, the plaintiffs challenge the district court's denial of municipal liability.  If a plaintiff fails to establish a constitutional violation by the individual defendants, then "the municipal defendants cannot be held liable under § 1983."  *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).  That is true (despite the plaintiffs' arguments to the contrary) even if the court applied the so-called segmenting rule in determining that the individual defendants were not liable.  *See Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 772, 777 (6th Cir. 2004).  Hence the district court correctly denied municipal liability here.

\*      \*      \*

The district court's judgment is affirmed.

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Circuit Judge, concurring. Although I concur fully in my colleagues' reasoned opinion, I write separately to emphasize that, while the Memphis Police Department did not violate any clearly established rule of constitutional law, its decision to use a tactical unit and the way it used that unit are, in these circumstances which stem from a suspected animal cruelty misdemeanor offense, appalling. The fact is that the police department's conduct, while not constitutionally impermissible, was certainly disproportionate. Had cooler and more rational heads prevailed, Moore's life likely would have been spared and Memphis Animal Services would still have been able to investigate the animal cruelty complaints it had received. "The care of human life and happiness, and not their destruction, is the first and only legitimate object of good government." Thomas Jefferson to the Republican Citizens of Washington County, Maryland (March 31, 1809), *reprinted in* 1 The Papers of Thomas Jefferson 98–99 (J. Jefferson Looney ed., 2004). The Memphis Police Department would do well to think about this admonition.