NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0503n.06

No. 17-3088

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CHERYL BEANS, Individually and as )
Administratrix of the Estate of Shane Allen Ryan, )
)
  Plaintiff-Appellant, )
)
v. )
)
CITY OF MASSILLON; KATHY CATAZARO- )
PERRY; WILLIAM C. PEEL; PAUL COVERT; )
JASON GREENFIELD; DAVID MCCONNELL; )
CITY OF CANTON, OHIO; WILLIAM J. HEALY,
II; BRUCE LAWVER; LISA M. BROUCKER;
CHARLES S. SALER; TRAVIS M. PELLEGRINO;
DONALD E. MILLER, JR.; BRANDON
SHACKLE; AND DAVID DAVIS

  Defendants-Appellees.

**FILED**
Aug 29, 2017
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

---

**BEFORE: SILER, SUTTON, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** In this action arising from the tragic shooting death of Shane Ryan by Defendant Charles Saler, a sergeant in the City of Canton Police Department, Plaintiff Cheryl Beans appeals the district court's grant of summary judgment to Defendant cities, mayors, and police officers on the basis of qualified immunity. We **AFFIRM**.

## I. Background

On July 28, 2013, Shane Ryan attempted to reach his ex-girlfriend, Heather McLendon, by phone. When McLendon did not answer, Ryan walked ten miles to McLendon's employer, Great Clips Hair Salon (Great Clips), in Massillon, Ohio. On his walk, Ryan called the Crisis

Intervention and Recovery Center (Crisis Center).[1]  The Crisis Center then contacted the Stark County Sheriff's Office and reported the call, and the sheriff's office began actively looking for Ryan.  Through tracking technology, the sheriff's office concluded that Ryan was in Massillon. The sheriff's office called the City of Massillon Police Department and spoke to Lt. Jason Greenfield.  In the meantime, Ryan had arrived at Great Clips looking for McLendon, and discovered that she was not working that day.  Armed with a knife and scissors, Ryan took Great Clips employee Heather Patterson hostage in the salon's utility room; the remaining customers and employees evacuated the building.  An unidentified person called 911, and the Massillon police were dispatched to the salon.  During his conversation with the sheriff's office, Greenfield received a call alerting him that there was a hostage situation at Great Clips.  Greenfield immediately hung up with the sheriff's office; he did not realize at the time that the hostage situation and the call from the sheriff's office were related.

Shortly after the 911 call, Sergeant Brian Muntean arrived at Great Clips, informed dispatch that there was a hostage situation, and requested backup.  Various Massillon officers responded, including Detective David McConnell and Greenfield, who was the officer in charge of the shift that day.  The officers entered and remained inside the salon while Ryan was in the utility room with Patterson.  McConnell testified at deposition that when he arrived on the scene, he heard Ryan state that "he wanted to die today," and then demand to speak with McLendon. Greenfield testified at deposition that he also heard Ryan say "I'm going to die today.  You will have to kill me.  I'm going to force you guys to kill me."  R. 71, PID 2064.  Recognizing the gravity of the situation, Greenfield called dispatch and asked them to contact Canton's SWAT

---

[1]  The record is silent as to what Ryan said during the phone call.

team for assistance.[2] Greenfield was told that the Canton SWAT team could arrive in approximately 40 minutes.

Sergeant Charles Saler, the leader of the Canton Regional SWAT Team, was informed that there was a hostage situation at Great Clips with an armed hostage taker, and notified the other members of his team. Saler was told that a worker was being held at knifepoint and that the Massillon police were unsure whether Ryan had other weapons.

Meanwhile, McConnell began a conversation with Ryan in an effort to defuse the situation. Ryan told McConnell that he needed a cigarette. McConnell discovered a shopping bag with loose tobacco, cigarette-rolling papers, and a lighter on the salon's counter, and exchanged these materials with Ryan for his knife and scissors. About fifteen minutes after the exchange, McConnell called Ryan's cell phone and asked to speak with Patterson. Ryan acceded and gave Patterson the phone. McConnell asked Patterson if Ryan had any other weapons, and Patterson responded that she did not see any other weapons. McLendon arrived on the scene and the officers arranged for her to call Ryan. The call went poorly: Ryan became angry and yelled at McLendon that "[she] caused this," and stated that he wanted to exchange Patterson for McLendon. R. 71, PID 2079. When he learned that there would be no exchange, Ryan hung up.

The Canton Regional SWAT Team arrived, and Greenfield briefed them on the situation while in the parking lot of the salon. Saler testified that while the SWAT team was being briefed, Captain Paul Covert came out of the building and informed them that "Shane Ryan was yelling that he was going to both kill the hostage, pull the gas line, and blow up the building." R. 62, PID 1486. Greenfield testified at deposition that at this point the situation had "turned really nasty really fast." R. 71, PID 2080. Ryan had threatened that he was going to blow the

---

[2] Massillon does not have its own SWAT team.

room up in fifteen minutes. Specifically, he announced that he had opened the natural-gas lines, and that he was going to kill Patterson and use his lighter to blow up the building. Greenfield testified at deposition that "you could tell the whole level of everything had changed in there. The suspect was yelling. And before like when we would hear Patterson . . . we could hear her whimpering here and there. Now she was crying really loud. . . . It went from a zero to 100 miles an hour. There is a problem. You know, is he going to blow the room up?" R. 71, PID 2138. The officers consulted and agreed that, given the imminent threat, they had to breach the utility room.

Saler was tasked with creating the hostage-rescue strategy, and he determined that nonlethal weapons such as Tasers and beanbag shotguns should not be used because they are inaccurate and they risked igniting any gas in the room and causing an explosion. Saler acknowledged, however, that using his firearm also risked causing an explosion. Saler instructed Greenfield to "[s]ee if you can get [the gas] secured" by shutting off the utilities to the building. R. 62, PID 1544. However, the officers were unable to shut the utilities off before breaching the room; Saler testified that it usually takes between 30 minutes and four hours to get the gas company to shut off the utilities to a building.

Prior to ordering the officers to breach the utility room, Saler again heard Ryan threaten to blow up the building. Saler was the first officer to enter the utility room and, with his gun drawn, he yelled to Ryan: "Police. Down now. Let her go." R. 62, PID 1512. Saler testified that instead of complying, Ryan moved behind Patterson, pulled her close to him, and attempted to ignite the lighter but failed. Saler saw Ryan spin the lighter's flint-wheel and the lighter spark, but not ignite. Saler also testified that he could have shot Ryan from the doorway, but he was "trying to give Mr. Ryan the best option to surrender." R. 62, PID 1520.

What happened next is partially in dispute. Saler testified at his deposition that, after seeing Ryan attempt to ignite the lighter, he rushed at him and attempted to use his shield to wedge Patterson away from Ryan. This maneuver was unsuccessful; Ryan did not let go of Patterson or the lighter. Saler testified that he then shot Ryan once in the lower-left rib cage. Despite this initial shot, Ryan continued to hold onto the lighter and Patterson, leading Saler to shoot Ryan in the side of the head. The officers attempted to administer first aid, but Ryan was already dead. The incident lasted only a few seconds.

Beans stresses the statements made by Massillon police officer Kervin Brown during the post-shooting investigation conducted by the Stark County Sheriff's Office.[3] Specifically, Brown stated in his interview that he followed the Canton Regional SWAT Team into the utility room, the SWAT team shielded Patterson away from Ryan, and Brown then helped evacuate Patterson out of the room. Brown stated that he heard the two gun shots after he was in the process of removing Patterson from the room, and that Patterson was already at the door of the utility room when the shots went off. However, Brown also corroborated that Ryan threatened to blow up the building and "sound[ed] very serious." R. 59-11, PID 1349.

On July 27, 2015, Beans filed this action in the Northern District of Ohio. On October 2, 2015, at the request of the parties, the district court agreed to bifurcate discovery, allowing the parties to first conduct discovery on the question of qualified immunity. After the completion of this discovery, the parties filed cross-motions for summary judgment. Defendants also moved to strike the transcriptions of Brown's interview, as well as of other interviews conducted in the sheriff's office's investigation.

---

[3] Officer Brown is not a defendant in this case, and Beans neither deposed nor obtained an affidavit from Brown. Brown's statements in the investigation were unsworn.

Finding no constitutional violation, the district court concluded that Defendants were entitled to qualified immunity and granted Defendants' motions for summary judgment.

## II. Analysis

Beans limits her appeal to two issues: (1) whether Defendants violated the Americans with Disabilities Act by failing to make accommodations for Ryan's mental illness; and (2) whether there was a genuine dispute of material fact regarding whether Saler's use of lethal force was unconstitutionally excessive.

### A. Standard of Review

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). However, inferences should only be drawn "to the extent supportable by the record." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). Where the material facts are not in dispute, the question whether a police officer's use of force was objectively unreasonable is "a pure question of law." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott*, 550 U.S. at 381 n.8). We review the district court's grant of summary judgment de novo. *Marvin v. City of Taylor*, 509 F.3d 234, 240 (6th Cir. 2007).

### B. The ADA Claim

Beans argues that Defendants' conduct during the standoff constituted a violation of Title II of the Americans with Disability Act (ADA). Specifically, Beans asserts that Defendants should have "considered [Ryan's] mental disability before bursting into the room," Appellant Br. at 19, that the officers should have used Tasers instead of live ammunition, and that the City of Massillon "does not qualify their officers in crisis intervention training" and does not "have

policies in force that outlined how emotionally disturbed people should be treated." Appellant Br. at 17.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities, of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prevail on a Title II claim, Beans must show a prima facie case of discrimination. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). This requires Beans to show that: "(1) [Ryan had] a disability; (2) [Ryan was] otherwise qualified; and (3) [Ryan] was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program [of a public entity] because of [his] disability." *Id.* Beans is required to show that Defendants' actions were taken because of Ryan's disability, "i.e., the '[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* (quoting *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006)). Although Beans must show that the discrimination "was *intentionally* directed toward [Ryan] in particular," *id.* (quoting *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008) (emphasis in original)), Beans need not show that Ryan's disability was the "sole cause" of the discrimination. *Id.* at 357 n.1.

Assuming that Title II applies to arrests[4] and that Ryan had a qualifying disability under the ADA, we agree with the district court that there is no genuine issue whether the officers acted

---

[4] We have never determined whether Title II applies to arrests. *See Everson v. Leis*, 412 F. App'x 771, 775 (6th Cir. 2011) ("[W]e affirm the grant of summary judgment in favor of defendants without deciding whether Title II applies to arrests."). Because Beans's claim fails even if Title II applies to arrests, we need not decide the issue.

because of Ryan's disability rather than his threatening and dangerous behavior. This case is largely indistinguishable from *Thompson v. Williamson Cty., Tenn.*, 219 F.3d 555 (6th Cir. 2000). In *Thompson*, police were called by "the decedent's brother . . . because his brother, who was 'kinda mentally handicapped,' had 'just flipped his wig' and was in the house threatening their father with a machete." 219 F.3d at 556. After the officers arrived, the decedent allegedly "raised one of the machetes as if to throw it at [the officer], whereupon [the officer] shot and killed the decedent." *Id.*

The *Thompson* plaintiffs—the decedents' parents—alleged that the defendants—the shooting officer and the county that employed him—violated Title II of the ADA because they did not have a formal policy on how to interact with mentally disabled individuals, and that the decedent should have been taken to a medical facility. *Id.* at 558 n.5. We affirmed the grant of summary judgment to the defendants, reasoning that even if the plaintiffs showed that the decedent was denied access to a public service, they failed to show that the denial was because of the decedent's mental disability. *Id.* at 558. We concluded that the failure to disarm the decedent "was not because [the officer] was inadequately trained to deal with disabled individuals, but because the decedent threatened him with a deadly weapon before he could subdue him. Thus, if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled." *Id.*

Here, like in *Thompson*, the officers only employed deadly force against Ryan because he threatened to kill his hostage and blow up the salon—not because of Ryan's disability. Beans has failed to offer evidence of *any* animus by Defendants against people with mental illnesses, let alone that "animus against the protected group was a significant factor" in Defendants' conduct. *Anderson*, 798 F.3d at 357. Because Beans has not created a genuine issue of material fact

regarding whether Defendants discriminated against Ryan based on his disability, we affirm the district court's grant of summary judgment on this claim.

### C. The Excessive Force Claim

Beans next argues that the district court erred in finding that Saler's use of force was objectively reasonable as a matter of law and that Defendants were therefore entitled to qualified immunity. Beans's argument depends almost entirely on the unsworn statements of Officer Kervin Brown during the Stark County Sheriff's Office's investigation of the shooting. Brown stated he and other officers were escorting Patterson out of the room when he heard the two gunshots. The district court declined to consider Brown's statements because it found them to be incompetent hearsay testimony inappropriate for consideration on a motion for summary judgment. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence . . . must be disregarded."). Beans asserts that the district court's evidentiary decision was incorrect, and that Brown's statements show Patterson was no longer in danger from Ryan, and contradict the testimony given by Defendants, creating an issue of material fact. We need not resolve the evidentiary question because even if we assume, arguendo, that the district court should have considered Brown's statements, Beans has failed to create a dispute of material fact as to the reasonableness of Saler's use of force.

Government officials are entitled to qualified immunity unless their conduct violates a statutory or constitutional right that has been clearly established such that "a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). "Because it is axiomatic that individuals have a clearly established right not to be shot absent probable cause to believe that they pose a threat of serious physical harm, either to

the officer or to others, we must determine whether, in light of the facts and circumstances of this case, [Saler's] use of deadly force violated [Ryan's] right to be free from excessive force." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (internal quotation marks, modifications, and citations omitted).

To determine whether force is unconstitutionally excessive, we consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Graham v. Connor*, 490 U.S. 386, 397 (1989). We use a non-exclusive three-factor test to evaluate the reasonableness of an officer's use of force: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006). The ultimate question, however, is "whether the totality of the circumstances justified the use of force." *Mullins*, 805 F.3d at 765 (internal quotation marks and citation omitted). An officer's decision to employ deadly force is judged from the perspective of an officer at the scene, and not "with the 20/20 vision of hindsight." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

All three *Graham* factors weigh in favor of Defendants. The crime—taking a hostage and threatening to kill her and cause an explosion in the salon—was obviously severe. Ryan also posed an immediate threat to the safety of Patterson and the SWAT team officers and was unquestionably resisting arrest at the time of the deadly force. Moreover, the totality of the circumstances justified Saler's use of force. After Ryan informed the officers that he would kill Patterson in the next fifteen minutes, it was not unreasonable for the officers to breach the utility room and, once Ryan attempted to ignite the lighter and cause an explosion, to use deadly force

to ensure Patterson's and the officers' safety. Beans points to deposition testimony that the officers on the scene did not smell gas in the room as evidence that there was no imminent threat and the use of deadly force was therefore unreasonable. However, the entire incident unfolded in a matter of seconds. It was not unreasonable for Saler and the SWAT team to act without definitively determining whether gas was present in the room; any hesitation by the officers could have allowed Ryan to ignite the lighter and trigger an explosion.

Officer Brown's statements do not change this analysis. Beans asserts that Brown's statement that Patterson had reached the doorway when Brown heard gunshots undermines Defendants' testimony that Ryan was holding onto Patterson when he was shot. Though Brown's statement conflicts with Saler's testimony, the disagreement is immaterial. Saler reasonably believed that Ryan was capable of causing an explosion that may have reached Patterson even if she had reached the doorway. Moreover, Saler was standing right in front of Ryan when he shot him. Thus, even if Patterson had been evacuated to safety, Saler was directly exposed to the danger of a potential explosion.

Additionally, Brown himself stated that Ryan "sound[ed] very serious about what [he was] doing. . . . [I thought] this guy may blow us all up." R. 59-11, PID 1349.

Beans provided no evidence contradicting the officers' consistent testimony that Ryan threatened to kill Patterson and cause an explosion in the building, and that Ryan had a lighter and attempted to ignite the lighter. It is these factors, not Patterson's exact location in the utility room, that gave Saler probable cause to believe that Ryan posed a serious and immediate threat of physical harm. Although the result is tragic, Saler did not act unreasonably under the circumstances in using deadly force against Ryan.

**III. Conclusion**

For these reasons, we **AFFIRM** the district court's grant of summary judgment to Defendants.