NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0135n.06

Case No. 22-3570

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FILED

Mar 15, 2023

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| SCOTT OSBORN, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY OF COLUMBUS, OHIO, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant, | ) | |
| | ) | |
| ELIJAH LADIPO; JESSE SMITH, | ) | |
| Defendants-Appellants. | ) | O P I N I O N |
| | ) | |

Before: COLE, NALBANDIAN, and READLER, Circuit Judges.

COLE, J., delivered the opinion of the court in which NALBANDIAN, J., joined. READLER, J. (pp. 14–16), delivered a separate opinion concurring in part and dissenting in part.

COLE, Circuit Judge. Scott Osborn sought help from the police after losing control of his vehicle and crashing into parked cars. Osborn's initial encounter with the City of Columbus police officers spurred a multi-minute struggle, beginning with Osborn being body slammed to the ground, punched repeatedly in the head and torso, tased twice, and maced twice, and ending with him being handcuffed, hobble-strapped, and charged with obstructing official business and resisting arrest. Osborn filed suit against the City and relevant named and unnamed officers and supervisors relating to his injuries and the subsequent legal proceedings, all of whom moved for summary judgment. Osborn voluntarily dismissed some claims against the City and three of the officers, and the district court granted summary judgment as to the remaining claims against those

defendants. As to Officers Ladipo and J. Smith, the district court denied summary judgment on Osborn's excessive force, assault and battery, and intentional infliction of emotional distress claims, which they now appeal. Because we agree that a reasonable juror could find in Osborn's favor on these claims, we affirm the district court's denial of summary judgment as to Officers Ladipo and J. Smith.

## I. BACKGROUND

### A. Facts

Early one morning, Osborn lost control of his car, struck an overpass, and crashed into two parked cars in Columbus, Ohio. City of Columbus police officers Elijah Ladipo and Jesse Smith ("Officers") were dispatched to investigate the accident. Upon their arrival, Osborn approached Ladipo's side of the police car. But the similarities in the parties' recitation of the facts end there.

From the Officers' perspective, Osborn was a concerning presence from the get-go. According to Ladipo, Osborn approached him with his hands in his pockets and then held up an unknown object. Osborn ignored his requests to back up and then Osborn approached Ladipo again after being pushed away. Because of the actions Ladipo observed since his arrival, he believed Osborn had violated the city's disorderly conduct statute and had reasonable suspicion of a violation related to the accident, and determined it was necessary to detain him.

J. Smith believed Osborn was being detained because Osborn was "stopping [them] from investigating the accident" by not "adhering" to their commands to "get on his stomach, to put his hands behind his back." Though he did not know exactly what had happened that warranted the detainment, he "trusted that Officer Ladipo did." Ladipo said Osborn's detainment was "not an arrest," but rather a method of securing Osborn based on his belief that he was involved in the accident. J. Smith similarly differentiated between someone being detained and being arrested,

and reiterated that Osborn was being detained, not arrested, but noted that he was "not sure" if Osborn understood if or why he was being detained.

Because Osborn pulled away from Ladipo's initial attempt to detain him and was "not responding to verbal commands," Ladipo "performed a level 1 takedown of [Osborn.]" J. Smith gave no verbal commands before engaging with Osborn, and provided inconsistent reports about whether he heard Ladipo give any commands to Osborn prior to taking him down. Both Ladipo and J. Smith asserted that Osborn began actively resisting almost immediately, pulling away, rolling over, and kicking his legs, to which Ladipo responded with the first set of punches to Osborn's torso. After Osborn again "refused to comply with commands . . . and attempted to kick his legs toward [Ladipo]," the officers considered Osborn a "maximum resister."

As Osborn continued his "resistive and assaultive behavior," J. Smith punched Osborn in the face three times. Ladipo attempted to control Osborn's head and put his knee on Osborn's shoulder. Ladipo had one knee on Osborn's back and control of one of Osborn's arms when J. Smith first tased Osborn. Ladipo said Osborn continued to ignore his commands and "wrestle," which brought on another round of tasings from J. Smith. The tasings were "ineffective," as were J. Smith's subsequent five punches to Osborn's face.

Osborn recounts a different story. According to Osborn, he approached the passenger side—Ladipo's side—of the car believing the police were there to help him since he had called 911. He claimed he walked up with his hands in the air holding his phone, and that the officer—now known to be Ladipo—did not do, say, or ask anything before he picked Osborn up, held his arms at his sides, swung him into the air, and took him to the ground. Osborn asserted this takedown happened "[o]nly about one second" after he first approached the police car. Throughout the punches, kicks, and tases from the officers, Osborn remembered being submissive and going

in and out of consciousness, and that the Officers repeatedly asked him to give them his hands while the Officers had control of them, rendering him unable to comply. He recalled trying to cover his face, ribs, and torso, but said he did not kick the Officers. He said that at no point was he made aware why he was being detained or that he was under arrest, and that he still does not understand what triggered the uses of force.

Officers Brian Smith, Nicholas Geno, and Ian Wilkinson later arrived, assisting Ladipo and J. Smith in handcuffing and hobble-strapping Osborn. During this final struggle, B. Smith maced Osborn twice.

As a result of this incident, Osborn was transported to the hospital for treatment for seven broken ribs, injuries from the strikes to his ribs and head, a concussion, a laceration to his right cornea, and bleeding from his eardrum. Osborn continues to experience vision impairment, hearing loss, pain in his ribs and neck, memory loss, and post-traumatic stress disorder.

**B. Procedural History**

Osborn filed suit in the court of common pleas against the City of Columbus; Officers Ladipo, J. Smith, B. Smith, Geno, and Wilkinson; and unknown officers and supervisors, alleging state law claims for assault and battery, malicious prosecution, wrongful imprisonment, and intentional infliction of emotional distress, and 42 U.S.C. § 1983 causes of action alleging excessive force, malicious prosecution, false imprisonment, and failure to train and supervise under *Monell* liability. The defendants removed the case to federal court. The five named officers and the City moved for summary judgment, Osborn responded, and the defendants replied. In his responses, Osborn voluntarily dismissed all claims against Geno and Wilkinson and his state law claims against the City.

The district court granted summary judgment to the City on the remaining *Monell* claim, finding that Osborn was unable to prove the City either ratifies unconstitutional uses of excessive force or inadequately trains and supervises its officers. The district court also granted summary judgment for Ladipo and J. Smith on Osborn's false arrest and imprisonment and malicious prosecution claims. Finally, the district court found B. Smith was entitled to both qualified and statutory immunity on all the claims against him: Fourth Amendment excessive force and state law assault and battery and intentional infliction of emotional distress. But the district court denied summary judgment to Ladipo and J. Smith on these same claims, finding that there remain genuine disputes of material facts regarding qualified and statutory immunity. Ladipo and J. Smith sought an interlocutory appeal from the denial of qualified immunity, bringing us to this decision.

## II.  ANALYSIS

We review a district court's decision at the summary judgment stage de novo. *Summer v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004). Summary judgment is inappropriate if the evidence presented reveals a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (citing Fed. R. Civ. P. 56(c)). Material facts are "facts that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* We look to materials in the record to determine if the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(1). "In conducting the summary judgment analysis, we must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party"—in this case, Osborn. *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

## A. Excessive Force Claim

Qualified immunity shields government officials from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At the summary judgment stage, qualified immunity does not apply if the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) an officer's conduct violated a plaintiff's constitutional rights, and (2) the right was clearly established and one of which a reasonable officer would have known. *Id.* at 818–19.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[A]n officer seizes a person when he uses force to apprehend [them]." *Torres v. Madrid*, 141 S. Ct. 989, 993 (2021). "Thus, to be constitutional, [the force] must be reasonable," not excessive. *Stewart v. City of Euclid*, 970 F.3d 667, 672 (6th Cir. 2020); *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

Whether a seizure violates the Fourth Amendment turns on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances." *Graham*, 490 U.S. at 397. So, qualified immunity is inappropriate on an excessive force claim where an officer's use of force was objectively unreasonable, which turns on: (1) "the severity of the crime at issue," (2) whether the individual posed an immediate safety threat, and (3) whether the individual was "actively resisting arrest or attempting to evade arrest[.]" *Id.* at 396; *see also Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017) (citing *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)). This is a totality of the circumstances analysis. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985); *see also Roell v. Hamilton Cnty.*, 870 F.3d 471, 481 (6th Cir. 2017).

Importantly, at the summary judgment stage, we need not conclusively decide whether Osborn's Fourth Amendment rights were violated by the Officers' uses of force, or whether such violation was clearly established. Rather, we ask if Osborn presented sufficient evidence to create a genuine dispute of material fact as to both of these questions in response to the Officers' assertion that there is none. *See Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015). And if he has, qualified immunity must be denied, and such disputes must be reconciled by the fact-finder. *Hernandez v. Boles*, 949 F.3d 251, 258–59 (6th Cir. 2020) (quoting *Goodwin*, 781 F.3d at 320–21).

Osborn's Fourth Amendment rights were violated if the Officers used objectively unreasonable force, so our analysis begins here. Osborn's argument points to, and the district court's analysis considers, multiple uses of force: Ladipo's initial takedown of Osborn, Ladipo striking Osborn in the torso twice, J. Smith striking Osborn in the face three times, J. Smith tasing Osborn for five seconds, J. Smith punching Osborn in the face five times, and Ladipo kneeling on Osborn's head and neck while other officers hobble-strapped Osborn.

*1. Reasonableness of Force*

Considering the *Graham* factors, and resolving all disputed questions of fact in Osborn's favor, we cannot conclude the Officers' conduct was objectively reasonable, and therefore such force is excessive. *See Moore v. City of Memphis*, 853 F.3d 866, 870 (6th Cir. 2017) ("An officer's use of force is excessive if, under the totality of the circumstances, the force was objectively unreasonable.").

We start with the severity of the crime at issue, which weighs against the Officers' reasonableness. To start, the reason for Osborn and the Officers' encounter was a motor vehicle accident—the crime of failure to control a vehicle or reckless driving or something of the sort—

and there was no probable cause to arrest Osborn for such a crime at the time of the initial takedown. *See Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) ("[T]he fact that a plaintiff in a §1983 suit had committed no crime [when the officer first used force against him] clearly weighed against a finding of reasonableness."). In fact, both Ladipo and J. Smith agree there was no reason to arrest Osborn as of arrival to the scene, as even if they thought Osborn had broken the law, there was not sufficient evidence to establish probable cause. While Ladipo indicated that evidence later supported that Osborn had violated a disorderly conduct statute, this was not the case at the outset of the Officers' interactions, which they said was to "secure and detain" Osborn to "further investigate" the scene.

Regarding the second factor, whether a reasonable officer would consider Osborn an immediate threat to his or other people's safety, the parties provided conflicting evidence. It is not disputed that Ladipo took Osborn to the ground within seconds of their initial encounter. But the facts surrounding Osborn's behavior prior to the takedown, which are crucial to determine the reasonableness of Ladipo's initial use of force, are disputed.

As to this initial encounter, Ladipo asserted that he told Osborn to back up upon his approach, that Osborn had an unknown object in his hand, and that Osborn was not responding to verbal commands. But the body camera footage is silent for the first minute, including during the takedown when Ladipo claims he gave Osborn verbal commands, J. Smith provided inconsistent answers about whether he heard Ladipo give any commands, and Osborn testified that Ladipo gave no such command for him to respond to before being "slammed . . . to the ground." As to the "unknown object" that Ladipo believed could be a weapon, the body camera footage shows an electric screen, which cuts against the argument that a reasonable person would think the object was a weapon and instead supports that it was a cellphone, as Osborn and a witness asserted.

Viewing these facts in the light most favorable to Osborn—as we are required to do at the summary judgment stage—Ladipo took Osborn to the ground within seconds of an individual holding a cellphone approaching his car to seek help. Based on these facts, we cannot say that a reasonable officer would think Osborn was an immediate safety threat as of the time the Officers began their uses of force.

We move on to the third factor: whether Osborn was resisting arrest. "The general consensus among our cases is that officers cannot use force . . . on a detainee who . . . is not told he is under arrest, or is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) (collecting cases). As discussed, both Ladipo and J. Smith agree there was no reason to arrest Osborn as of their arrival to the scene. While Ladipo indicated that he eventually believed Osborn violated the disorderly conduct statute, at no point was Osborn told he was under arrest, let alone what for. According to J. Smith, he was unsure if Osborn even knew why he was on the ground. Combined, that Osborn reasonably had no idea he was under arrest cuts against the Officers' assertion that he was resisting arrest.

Regardless of arrest status, Osborn argues that he was not actively resisting arrest, and that any lack of compliance was due to the Officers having control over his body. As to the initial use of force, Osborn's "resistive behavior" is disputed. Osborn repeatedly claimed that he was not given any verbal commands to respond to before being taken down, J. Smith provided inconsistent answers about whether he heard any such commands, and the body camera footage does not reveal evidence to the contrary due to the lack of sound at the beginning. As there are conflicting reports as to whether Ladipo issued a verbal warning or command prior to using force on Osborn, we cannot find that, based on Osborn's versions of events, the takedown was objectively reasonable. *See Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009) (denying qualified immunity

where the officers attempted to take the plaintiff's belongings and began to use force without warning or further instruction); *Richards v. County of Washtenaw*, 818 F. App'x 487, 492–93 (6th Cir. 2020) (denying qualified immunity where parties provided conflicting reports as to whether the officers issued verbal commands or provided the plaintiff enough time to comply with commands before using force).

As to affirmative actions that could be considered resistance, Osborn attempted to pull his hand away when Ladipo initially reached for his arms, and Osborn moved his body in a way to protect his head and torso during the takedown and the Officers' uses of force against him. But such movement could be considered minimal, passive resistance that cannot justify the Officers' uses of force, and whether this movement constitutes "resistance" in this situation creates a question of fact better suited for a jury. *See Smith v. City of Troy*, 874 F.3d 938, 945–46 (6th Cir. 2017) (finding "a genuine factual dispute regarding whether [plaintiff's] failure to put one of his arms behind his back while lying face-down on the ground constitutes 'resistance' sufficient to justify forc[e.]"); *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006) (denying qualified immunity where "no reasonable policeman" could see the force in response to an individual failing to produce her hands for cuffing as "nonexcessive."). Indeed, some of Osborn's behavior indicated a desire to comply, not resist: He responded "yes, sir" after being told to put his hands behind his back, apologized, prayed out loud, and repeated "you guys, I'm not doing anything."

Osborn also asserts he was prevented from complying by the individuals claiming he did not comply, and that such alleged lack of compliance is now being framed as him resisting arrest. It is undisputed that Ladipo and J. Smith gave Osborn commands he did not comply with. But whether he was able to comply with the commands is disputed, which impacts whether the repeated

punches and tases were reasonable. Osborn reported being unable to brace himself while being taken down because Ladipo had both arms around him. Osborn contended that he was physically unable to comply with the Officers' requests due to his medically unstable condition, that he could not move his arms behind his back because the Officers had control of his arms, and that he could not roll onto his stomach as requested because an officer was kneeling on his shoulder while he was on his side. And this lack of compliance is now the justification for him being punched multiple times and tased and maced twice. Body camera footage arguably corroborates Osborn's statement that the Officers had control of at least one, and sometimes both, of Osborn's arms at the time the Officers were giving him commands. Viewing the contested facts in Osborn's favor, Osborn was not actively resisting arrest, particularly considering the plausible inference that he did not know he was being arrested. So, based on Osborn's version of events, we cannot find that the Officers' actions were objectively reasonable.

In aggregate, the *Graham* factors support Osborn's assertion that the Officers arguably acted in an objectively unreasonable manner, violating his right to be free from excessive force. At a minimum, Osborn put forth sufficient facts to create a genuine dispute of material fact on this prong.

### 2. Constitutional Rights

Because we conclude that, based on Osborn's version of events, the Officers violated Osborn's Fourth Amendment Rights, we move on to consider whether the right at issue was clearly established. As a starting point, we have long and consistently held that the general right to be free from excessive force is clearly established law. *See, e.g.*, *Graham*, 490 U.S. at 399; *Rudolph v. Babinec*, 939 F.3d 742, 752 (6th Cir. 2019); *Brown v. Lewis*, 779 F.3d 401, 419 (6th Cir. 2015); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (quotation omitted);

*Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993), *superseded by statute on other grounds as stated in Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407–08 (6th Cir. 2007).

"The claimed right must be sufficiently particularized." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 583 (6th Cir. 2022). Osborn "need not . . . put forth a case directly on point" or "show that the very action in question has previously been held unlawful." *Id.* (internal quotations omitted) (first citing *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam), then *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). And "[t]here can be 'notable factual distinctions between the precedents relied on.'" *Champion*, 380 F.3d at 902 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). The question is whether "a reasonable official would understand that what he is doing violates that right." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) (quoting *Anderson*, 483 U.S. at 640).

Accepting the facts as laid out above and the genuine disputes that remain, a reasonable juror could find that multiple of Osborn's clearly established constitutional rights were violated by such potentially unreasonable uses of force. These rights include: (1) the right not to be tased if he displays passive resistance or no resistance, *see Goodwin*, 781 F.3d at 325–27; (2) the right not to be tased and punched if he is not under arrest and does not pose a threat to others' safety, *see Wright v. City of Euclid*, 962 F.3d. 852, 869–70 (6th Cir. 2020); *City of Circleville*, 583 F.3d at 366–67; and (3) the right not to have strong physical force used against him absent directions or commands or giving him the time or opportunity to comply, *see Richards*, 818 F. App'x at 492–93. So, considering the totality of the circumstances, and viewing the facts in the light most favorable to Osborn, an officer in Ladipo or J. Smith's shoes would have been "on notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8.

Measured against this legal backdrop, Osborn's claim survives the Officers' qualified immunity defense, and summary judgment is inappropriate. Osborn's excessive force claim against Ladipo and J. Smith should proceed to trial.

**B. Assault and Battery and Intentional Infliction of Emotional Distress Claims**

Ladipo and J. Smith assert that the district's denial of statutory immunity was erroneous because it relied on the district court's erroneous denial of qualified immunity on the excessive force claim. We disagree.

"Defendants' statutory immunity defense stands or falls with their federal qualified immunity defense." *Hopper v. Phil Plummer*, 887 F.3d 744, 760 (6th Cir. 2018). Where "resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive force determination under § 1983," state-law immunity is inappropriate if qualified immunity is inappropriate. *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013). As we found disputed material facts regarding Osborn's excessive force claims, and the facts underlying Osborn's excessive force claims also form the foundation for his assault and battery and intentional infliction of emotional distress claims, we similarly find disputed material facts here. So as Officers Ladipo and J. Smith are not entitled to qualified immunity, they are also not entitled to statutory immunity on the remaining state law claims. So, these claims also proceed to trial.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of qualified and statutory immunity to Ladipo and J. Smith on the excessive force, assault and battery, and intentional infliction of emotional distress claims.

**CHAD A. READLER, concurring in part and dissenting in part.** In assessing whether qualified immunity attaches to an officer's conduct, we customarily consider the officer's actions together, rather than in a hyper-segmented, piecemeal manner. *See, e.g.*, *Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015); *Palma v. Johns*, 27 F.4th 419, 453–54 (6th Cir. 2022) (Readler, J., dissenting). Were that the case here, Osborn would have a credible claim that Officer Ladipo's actions, taken as a whole, were not entitled to qualified immunity. But as the case has been litigated by the parties (and reviewed by the district court), Ladipo's initial takedown of Osborn was viewed separately from the punching, tasing, macing, handcuffing, and hobble-strapping that immediately followed. Under that segmented framework, I concur in the majority opinion save for its assessment of Ladipo's takedown of Osborn. On that claim, the officer is entitled to qualified immunity.

With the benefit of a body camera video capturing the relevant events, the parties' respective descriptions of the engagement take a back seat. In this setting, we "view the facts in the light depicted by the videotapes." *Rudlaff v. Gillespie*, 791 F.3d 638, 639 (6th Cir. 2015) (cleaned up). And we do so from the officer's real-time, heat-of-the-moment perspective, not as an armchair quarterback second-guessing the situation. Nor do we undertake a meticulous, frame-by-frame examination of the encounter as do replay officials determining whether the football crossed the goal line (officials, I should add, who study the game and the rulebook they enforce, *see* https://operations.nfl.com/officiating/instant-replay/nfl-replay-officials/, unlike judges, who typically have no training or expertise in public safety). *Cunningham v. Shelby County*, 994 F.3d 761, 767 (6th Cir. 2021).

To set the stage, consider some details that go unmentioned in the majority opinion. By the time of the takedown, the officers had witnessed Osborn causing a commotion and throwing

around what appeared to be car parts, surrounded by onlookers. Those acts were serious enough to amount to a violation of the Columbus disorderly conduct statute. *See* Columbus City Code § 2317.11(A); *State v. Ollison*, 78 N.3d 254, 264–65 (Ohio Ct. App. 2016) (recognizing violation when a defendant recklessly alarms, inconveniences, or annoys).

That takes me to the heart of the matter: whether a reasonable officer would consider Osborn an immediate threat to his safety. The body camera footage tells the tale (one, again, not fully told by the majority opinion). Upon arriving in their police cruiser, the officers saw Osborn pacing around a white van. Almost immediately after Officer Ladipo exited the cruiser, Osborn turned a tight corner around the cruiser and confronted Ladipo. Osborn was holding something in his hand (at this point, one cannot see that the object is Osborn's phone). Ladipo shoved Osborn back a few steps to create separation. Osborn stumbled back, but quickly regained his balance. Then, just feet from the officer, Osborn again moved towards Ladipo. At this point, Ladipo took Osborn down.

With Osborn repeatedly coming at him in close proximity, what option did Ladipo have other than to tackle Osborn? Shoot him with a taser, only to be sued for excessive force? Try to protect himself from the oncoming attacker, risking his own safety, possibly his life? Turn and run, thereby neglecting his duty to protect the public? From the video depiction, it is difficult to see how a reasonable officer would view Osborn as anything but a threat to the officer's safety. And a takedown seemingly was the most risk-averse tactic the officer could deploy to properly control the situation. That act falls well short of Fourth Amendment culpability. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (citations and quotations omitted)).

True, as the majority opinion notes, there was no audio available from the encounter. But what verbal exchange (or absence thereof) could have justified Osborn's repeated strikes at Ladipo? None come to mind. I am likewise willing to concede for today's purposes that Osborn was not formally resisting arrest, a point the majority opinion emphasizes. But an arrest is beside the point. The takedown, remember, was the result of Osborn charging Ladipo—not once, but twice—while holding an object in his hand.

To sum up the video evidence, an officer tackles a disturbed man, who, while feet away from the officer, undeterred by less forceful countermeasures, again charged the officer. Hardly the makings of excessive force. None of the cited cases say otherwise. In *Harris v. City of Circleville*, 583 F.3d 356, 366–67 (6th Cir. 2009), for example, the officer kicked the plaintiff's leg out from under him during the booking process after the plaintiff stepped back from the officer, then took the plaintiff to the ground when he refused to kneel while handcuffed. Unlike Ladipo, the officer there was never under attack. So too in *Richards v. County of Washtenaw*, 818 F. App'x 487, 492–93 (6th Cir. 2020), where an officer threw down a plaintiff who "did not continue to pose a threat" and was trying to pull away from the officer trying to grab his arm. Far from pulling away from Ladipo, Osborn kept coming at him, despite being pushed back.

Few professions require more on-the-spot judgments than does law enforcement. So long as those judgments are not objectively unreasonable beyond debate, law enforcement officers are entitled to qualified immunity. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curiam) ("A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' . . . '[E]xisting precedent must have placed the statutory or constitutional question beyond debate.'" (citations omitted)). That is undoubtedly the case as to Ladipo's initial takedown of Osborn.